## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| PAUL WHITE, Derivatively on Behalf of VENTURE GLOBAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL SABEL, JONATHAN THAYER, ROBERT PENDER, SARAH BLAKE, SARI GRANAT, ANDREW OREKAR, THOMAS J. REID, JIMMY STATON, RODERICK CHRISTIE, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, and BofA SECURITIES, INC., <br><br> Defendants, <br><br> and <br><br> VENTURE GLOBAL, INC. <br><br> Nominal Defendant. | Case No: _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Paul White ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Venture Global, Inc. ("Venture" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

### <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because:  (i) the Company maintains its principal place of business in this District; (ii) one or more of the Individual Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.  Venue is proper in this Division

because:  (i) the Company maintains its principal place of business in this Division; (ii) one or more of the Individual Defendants either resides in or maintains executive offices in this Division; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this Division; and (iv) the Individual Defendants have received substantial compensation in this Division by doing business here and engaging in numerous activities that had an effect in this Division.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.      Plaintiff is, and was at all relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of California.

### Nominal Defendant

7.      ***Nominal Defendant Venture*** is incorporated in the State of Delaware.  Its principal executive offices are located at 1001 19th Street North, Suite 1500, Arlington, VA 22209.  Venture conducted its initial public offering vis-à-vis numerous investment banks located in this District. Following its initial public offering, Venture's stock traded on the New York Stock Exchange (NYSE) under the symbol "VG."

3

**Director Defendants**

8.      **_Defendant Michael Sabel_** ("Sabel") was, at all relevant times, Venture's Chief Executive Officer, Director, Executive Co-Chairman of the Board, and Founder.  Sabel signed Venture's registration statement for the initial public offering.  Defendant Sabel also serves as a member of the Compensation Committee and Nominating Committee.  Upon information and belief, Defendant Sabel is a citizen of the District of Columbia.

9.      **_Defendant Robert Pender_** ("Pender") was, at all relevant times, Venture's Executive Co-Chairman, Director, and Founder.  Defendant Pender signed Venture's registration statement for the initial public offering.  He also serves as a member of the Compensation Committee and Nomination Committee.  Upon information and belief, Defendant Pender is a citizen of Virginia.

10.      **_Defendant Sari Granat_** ("Granat") has served as a director of the Company at all relevant times.  Defendant Granat also serves as a member of the Nominating Committee.  Upon information and belief, Defendant Granat is a citizen of New York.

11.      **_Defendant Andrew Orekar_** ("Orekar") has served as a director of the Company at all relevant times.  Defendant Orekar also serves as a member of the Audit Committee.  Upon information and belief, Defendant Orekar is a citizen of New York.

12.      **_Defendant Thomas J. Reid_** ("Reid") has served as a director of the Company at all relevant times.  Defendant Reid also serves as a member of the Compensation Committee.  Upon information and belief, Defendant Reid is a citizen of Pennsylvania.

13.      **_Defendant Jimmy Staton_** ("Staton") has served as a director of the Company at all relevant times.  Defendant Staton also serves as a member of the Audit Committee.  Upon information and belief, Defendant Staton is a citizen of Kentucky.

14.     **_Defendant Roderick Christie_** ("Christie") has served as a director of the Company at all relevant times.  Defendant Christie also serves as a member of the Audit Committee.  Upon information and belief, Defendant Christie is a citizen of Wisconsin.

15.     The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

16.     **_Defendant Jonathan Thayer_** ("Thayer") was, at all relevant times, Venture's Principal Financial Officer.  Defendant Thayer signed Venture's Registration Statement for the initial public offering.  Upon information and belief, Defendant Thayer is a citizen of Maryland.

17.     **_Defendant Sarah Blake_** ("Blake") was, at all relevant times, Venture's Principal Accounting Officer.  Blake signed Venture's Registration Statement for the initial public offering.  Upon information and belief, Defendant Blake is a citizen of Virginia.

18.     Defendants Thayer and Blake along with Defendants Sabel and Pender are collectively referred to herein as the "Officer Defendants."

19.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

**Underwriter Defendants**

20.     Defendants Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, and BofA Securities, Inc. served as underwriters of Venture's IPO and helped to draft and disseminate the offering documents (collectively, the "Underwriter Defendants").  Upon information and belief, each of the Underwriter Defendants is a citizen of New York.

21.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities.  They served as the underwriters of the IPO and shared $70 million in fees collectively.  The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Venture stock in the IPO.  The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Venture, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects;

(b)    The Underwriter Defendants also demanded and obtained an agreement from Venture that Venture would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws;

(c)    Representatives of the Underwriter Defendants also assisted Venture and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Venture, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Venture's operations and financial prospects;

(d)    In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Venture's lawyers, management, and top executives and engaged in "drafting sessions."

During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Venture stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Venture would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Venture's management and top executives, the Underwriter Defendants knew, or should have known, of Venture's existing problems as detailed herein; and

(e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof.

## SUBSTANTIVE ALLEGATIONS

### Background

22.    Venture, through its subsidiaries, engages in the development, construction, and production of natural gas liquefaction ("LNG") and export projects near the U.S. Gulf Coast in Louisiana.

23.    On January 23, 2025, Venture published a press release announcing pricing for its initial public offering, stating, in pertinent part:

> [Venture] announced today the pricing of its initial public offering of 70,000,000 shares of its Class A common stock, par value $0.01 ("Class A common stock") at a public offering price of $25.00 per share. In connection with the offering, Venture Global has granted the underwriters a 30-day option to purchase up to an additional 10,500,000 shares of Class A common stock. The shares of Class A common stock are expected to begin trading on the New York Stock Exchange on January 24, 2025 under the symbol "VG".

> The closing of the offering is expected to occur on January 27, 2025, subject to the satisfaction of customary closing conditions.

24.     On January 27, 2025, Venture published a Form 8-K announcing that its initial public offering had closed.  Defendant Thayer signed this statement, which also included a second amended and restated certificate of incorporation, amended and restated by-laws, and amended and restated shareholders' agreement.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

25.     On or about December 20, 2024, Venture Global filed with the SEC a Registration Statement on Form S-1.  After several amendments, on January 24, 2025, Venture Global and the Underwriter Defendants priced the IPO and filed the final Prospectus for the IPO, which formed part of the Registration Statement (collectively, the "Registration Statement").

26.     The Registration Statement was reviewed, approved, and signed by Defendants Sabel, Pender, Thayer, Blake, Granat, Orekar, Reid, Staton, and Christie.  The Individual Defendants amended the Registration Statement on January 13, 2025 and January 22, 2025.  On January 24, 2025, Venture filed its final prospectus for the Company's initial public offering, which was incorporated into the Registration Statement, and listed for sale 70 million shares of Venture common stock at an offering price of $25.00 per share.

27.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

28.     The Registration Statement positively described Venture's business strategy, stating:

> Venture Global has fundamentally reshaped the development and construction of liquefied natural gas production, establishing us as a rapidly growing company delivering critical LNG to the world.  Our innovative and disruptive approach,

which is both scalable and repeatable, allows us to bring LNG to a global market years faster and at a lower cost. We believe supplying this clean, affordable fuel promotes global energy security and is essential to meeting growing global demand.

29. As described in the Registration Statement, Venture is commissioning, constructing, and developing five natural gas liquefaction and export projects near the Gulf of Mexico in Louisiana: (i) Calcasieu Project; (ii) Plaquemines Project; (iii) CP2 Project; (iv) CP3 Project; and (v) Delta Project. Venture's Registration Statement represented the significance and benefits of Venture's fundamental reshaping of the development and construction of liquefied natural gas (LNG) production and the Company's ability to deliver LNG to the world, detailing its projects as follows:

We are commissioning, constructing, and developing five natural gas liquefaction and export projects near the Gulf of Mexico in Louisiana, utilizing our unique "design one, build many" approach. Each project is designed or is being developed to include an LNG facility and associated pipeline systems that interconnect with several interstate and intrastate pipelines to enable the delivery of natural gas into the LNG facility. As illustrated by the chart below, our five current projects are being designed to deliver a total expected peak production capacity of 143.8 mtpa, which consists of an aggregate of 104.4 mtpa expected nameplate capacity and an aggregate of 39.4 mtpa of expected excess capacity. These amounts do not account for any potential bolt-on expansion liquefaction capacity. The expected nameplate capacity of our facilities measures the minimum operating performance thresholds guaranteed by the equipment providers, and the expected excess capacity represents the additional LNG that we aim to produce above such guaranteed amounts. Although COD has not yet occurred under the post-COD SPAs for any of our projects, we have been generating proceeds from the sale of commissioning cargos at the Calcasieu Project since the first quarter of 2022, and expect to do so at each of our other projects during commissioning prior to achieving COD for the relevant project or phase of a project.

| Project Name | Number of Trains | Expected Nameplate Capacity | Expected Excess Capacity | Expected Peak Production Capacity | Stage of Development |
|---|---|---|---|---|---|
| Calcasieu Project | 18 | 10.0 mtpa | 2.4 mtpa[1] | 12.4 mtpa[1] | Commissioning |
| Plaquemines Project | 36 | 20.0 mtpa | 7.2 mtpa[1] | 27.2 mtpa[1] | Construction and Commissioning |
| CP2 Project | 36 | 20.0 mtpa[2] | 8.0 mtpa[2] | 28.0 mtpa[2] | Engineering, Procuring Materials, and Manufacturing Modules |
| CP3 Project | 54 | 30.0 mtpa[2] | 12.0 mtpa[2] | 42.0 mtpa[2] | Development |
| Delta Project | 44 | 24.4 mtpa[2] | 9.8 mtpa[2] | 34.2 mtpa[2] | Development |

30. The Registration Statement highlighted that the Company makes sales of LNG during the commissioning of its projects and before they are commercially operational. The Registration Statement stated:

> By design, conventional, stick-built projects generally only engage in several months of commissioning production, thereby limiting the number of cargos produced before full commercial operations occur. Due to our unique modular development approach and configuration consisting of many mid-scale liquefaction trains, which are delivered and installed sequentially, it is necessary to commission and test our LNG facilities sequentially over a longer period of time than traditional LNG facilities with substantially fewer, larger-scale liquefaction trains. The commissioning of the liquefaction trains at our facilities begins while portions of our facilities remain under construction.
>
> This important reliability and technical requirement results in earlier production of LNG than with traditional LNG facilities. We believe this earlier production of LNG positions us to produce a substantial number of commissioning cargos for each of our LNG projects, generating proceeds that may be used to support any remaining construction work or fund subsequent projects and future growth. As an example of this, on March 1, 2022, we announced the successful loading and departure of our first cargo of LNG from the Calcasieu Project, just over two and a half years from our final investment decision for the project. By September 30, 2024, we had loaded and sold 342 LNG commissioning cargos and received approximately $19.6 billion in gross proceeds from such commissioning cargos.

31. The Registration Statement described the Company's LNG sales and purchasing agreements for its projects, stating:

> The project companies for the Calcasieu Project, the Plaquemines Project and the CP2 Project have signed LNG sales and purchase agreements, or SPAs, to sell LNG based on a pre-determined pricing formula that commences after we achieve the commercial operations date, or COD, of the relevant project or phase thereof. Under each such post-COD SPA, COD does not occur unless the applicable project company has notified such customer that (i) all of the project's facilities have been completed and commissioned, including any ramp up period, and (ii) the project is capable of delivering LNG in sufficient quantities and necessary quality to perform all of its obligations under such post-COD SPA.
>
> As of September 30, 2024, we have executed 39.25 mtpa of such post-COD SPAs with a well recognized set of third-party customers that we believe constitute one of the strongest portfolios of institutional LNG buyer credits in the world. Approximately 95% of our contracted post-COD SPAs – or 37.45 mtpa of such 39.25 mtpa – are 20-year fixed price agreements, providing a long-term stream of

contracted cash flow.  We have also executed 1.8 mtpa of post-COD SPAs on a short- and medium-term basis and we plan to continue to optimize our portfolio balancing profit, duration, and risk.

32.     The Registration Statement purported to warn about the volatility of proceeds from commissioning sales of LNG, stating:

> Historical proceeds from the sale of commissioning cargos at the Calcasieu Project, which has had an extended commissioning period due to unanticipated challenges with equipment reliability that we are in the process of remediating, may not be indicative of the duration of the commissioning period or the amount of proceeds for any future period or for any of our other projects.  See "Business – Our Liquefaction and Export Projects and Key, Complementary Assets – Calcasieu Project."  Although we have included targeted COD dates for our projects and phases thereof, there can be no assurance that COD will not occur earlier or later than such targets.  See "Business – Our Liquefaction and Export Projects and Key, Complementary Assets."  If COD occurs earlier than expected for a particular project or phase thereof, it would adversely impact our ability to generate proceeds from the sale of commissioning cargos, which, subject to market conditions, may otherwise be more valuable than the revenues earned under our post-COD SPAs.

> * * *

> As a result, we have experienced, and expect to continue to experience during the remainder of the commissioning phase, significant volatility in the proceeds we have generated from the sales of commissioning cargos from the Calcasieu Project.  Since we began generating proceeds from the sale of commissioning cargos in the first quarter of 2022, our quarterly gross proceeds have fluctuated from a maximum of $2.9 billion ($2.4 billion in net proceeds, after deducting net cash paid for natural gas) for the three months ended March 31, 2023, to a minimum of $1.0 billion ($0.7 billion in net proceeds, after deducting net cash paid for natural gas) for the three months ended September 30, 2023.  Accordingly, the proceeds we have generated from such sales of commissioning cargos of the Calcasieu Project to date may not be indicative of the duration of the commissioning period or the amount of proceeds from such sales for any future period for the Calcasieu Project or for any of our other projects.  As a result, such proceeds, and also our operating results more generally, may vary significantly from one fiscal period to the next comparable fiscal period.  Moreover, if we are not able to generate proceeds from the sale of commissioning cargos in the future that are comparable to such proceeds from the Calcasieu Project in the past, that could have a material adverse effect on our business, contracts, financial condition, operating results, cash flow, financing requirements, liquidity, prospects and the price of our Class A common stock.

33.     With respect to the cost of completing construction of the Plaquemines Project, the Registration Statement stated:

> We currently estimate that the total project costs for the Plaquemines Project will be approximately $22.5 billion to $23.5 billion, including EPC contractor profit and contingency, owners' costs and financing costs, of which approximately $17.7 billion had been paid for as of September 30, 2024.

34.     The above-referenced statements were false and/or materially misleading.  The Individual Defendants touted its innovative and disruptive approach, which they stated is both scalable and repeatable, allowing the Company to bring LNG to the global market years faster and at a lower cost.  The Individual Defendants further discussed the development of Venture's five natural gas liquefaction and export projects near the Gulf of Mexico in Louisiana, utilizing their unique "design one, build many" approach.  Therefore, the initial public offering represented to the public that Venture had the customer backing to implement its projects, allowing for the Company to deliver LNG to the world.

35.     By the time of the IPO, Venture had completed its fourth fiscal quarter of 2024. The Company's fourth quarter and year end results, however, were not provided in the Registration Statement.  The omission of this information was material as the Company's fourth quarter financial performance was worse than the market expected and, therefore, would have revealed that the Company's future earnings and prospects were far more risky than portrayed in the Registration Statement.

36.     The Registration Statement purported to detail "Risk Warnings" about Venture and its operations.  These risk warnings were insufficient because, at the time of the IPO, the Company's fourth quarter had been complete for almost a month and, accordingly, warning about hypothetical risks, when in fact some of those risks had already materialized, was materially misleading.

37.     The Individual Defendants knew of, yet failed to disclose, the following adverse facts:

(a)     that commissioning volumes at the Calcasieu Project were declining and had in fact declined during the fourth quarter of 2024 far in excess of levels expected by the market or purportedly warned about in the Registration Statement;

(b)     that the Calcasieu Project continued to be hampered by production issues that would further delay the project, reduce production volumes, and damage the Company's relationship with customers;

(c)     that the Company was internally projecting reduced production levels and income for 2025; and

(d)     that the cost of the Plaquemines Project was substantially in excess of the amounts listed in the Registration Statement – total cost of $23.3 billion-$23.8 billion.

## THE TRUTH EMERGES

38.     Contrary to the foregoing representations, Venture's business and prospects were called into question when TotalEnergies CEO, Patrick Pouyanne, announced that he had been approached by Venture to see if his company would be interested in a long-term supply contract for liquefied natural gas from the Calcasieu Pass terminal in Louisiana, but rejected the offer. According to news reports, Pouyanne stated that:  "I don't want to deal with these guys, because of what they are doing . . . . I don't want to be in the middle of a dispute with my friends, with Shell and BP."  Pouyanne also cited a lack of trust with respect to Venture.  According to Pouyanne, "The price of the LNG was so low . . . I said to my colleague, 'How is it possible to pay $1 less than the rest of the market?  What is the trick?'"

39. Venture is currently facing legal challenges from existing large clients, such as BP and Shell, due to delays in supply contracts as Venture commissions its projects. Given the fact that Defendants ability to deliver LNG to the world and to continue development of Venture's five natural gas liquefication and export projects depends on customer contracts, such as those mentioned above, the Individual Defendants' failure to account for and address these issues caused statements in Venture's Registration Statement to be false and/or materially misleading at the time of the initial public offering.

40. In response to the news, Venture's stock price declined from $19.68 per share on February 5, 2025 to $17.48 per share on February 6, 2025.

41. On March 6, 2025, before the market opened, Venture issued a press release announcing the Company's financial results for the fourth quarter and the year ended December 31, 2024. News reports highlighted that the Company posted earnings per share of $0.33 on revenue of $1.52 billion, which missed the average analyst estimate of $0.76 per share on revenues of $1.92 billion, that sales unexpectedly fell 6.7% year-over-year in the period, and that the Company had substantially increased its cost estimates for the Plaquemines Project.

42. On March 6, 2025, the price of Venture stock fell from $14.20 per share to $9.08 per share on extremely heavy trading volume.

43. Venture's stock currently trades at or around $8.71 per share, well below its $25.00 per-share initial public offering price.

## DAMAGE TO THE COMPANY

### Securities Class Action

44. On April 15, 2025, a securities class action complaint was filed in the United States District Court for the Eastern District of Virginia against the Company and Defendants

Sabel, Thayer, Pender, Blake, Granat, Orekar, Reid, Staton, and Christie, among other "Underwriter Defendants." The complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), in the case captioned: *FirstFire Global Opportunities Fund, LLC v. Venture Global, Inc.*, *et al.*, Case No. 1:25-cv-00633 (E.D. Va.) (the "Securities Class Action").

45. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Other Legal Challenges**

46. As alleged *supra*, as a result of the delays in supply contracts, Venture is now subject to defending itself in legal proceedings brought by large clients, such as BP and Shell. Accordingly, the Company is being forced to expend sums on its defense and will continue to expend sums on its continued defense and any liability or settlement that results.

**Unjust Compensation**

47. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

48. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed

to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated.

49.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

50.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

51.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

52.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

53.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.  Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

54.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations

as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Business Conduct**

55.    At all relevant times, the Company had in place its Code of Business Conduct ("Code of Conduct") which "summarizes the standards and principles that govern [the Company's] actions and engagements with others."

56.    In a section entitled "Our Guiding Principles," the Code of Conduct states:

The Company is committed to becoming the world's leading producer of clean, low-cost liquefied natural gas. The following principles are reflected in this Code, shape our culture, and guide our relationships with our stockholders, business partners, employees, communities and other stakeholders.

• *Commitment to safety*: We continuously strive to protect the health and safety of our employees, contractors and customers, and the communities in which we operate.

• *Prioritizing integrity*: We hold ourselves to the highest standards of honesty and accountability.

• *Engaging with others responsibly*: We ensure that our communications and interactions with each other, our business partners and our regulators are respectful, free from conflict and comply with all applicable laws and regulations.

• *Embracing innovation*: We encourage the development of new ideas, collaboration, problem solving and ingenuity to support our continuing growth.

• *Purposeful focus*: Our business is underpinned by a purposeful focus that drives thoughtful and comprehensive analysis of issues that impact our stakeholders, leverages creativity, proactively addresses challenges and improves directed outcomes.

57.    In a section entitled "Compliance with laws, Rules and Regulatory Requirements," the Code of Conduct states:

The Company's business and operations are subject to extensive regulation at the U.S. federal, state and local levels, and in certain foreign jurisdictions, and

compliance with all applicable laws and regulations is fundamental to the Company. We are strongly committed to conducting our business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations. No employee, officer or director of the Company shall commit an illegal or unethical act, or instruct others to do so, for any reason, in the performance of their duties. Each employee, officer and director is responsible for understanding, respecting and complying with the laws, rules and regulations applicable to his or her duties at the Company, and is accountable for any violations thereof.

***

The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure. The Company has established a Disclosure Committee consisting of senior management to assist in preparing and monitoring such disclosures.

## DUTIES OF THE DIRECTOR DEFENDANTS

58.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

59.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

60.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are

required to act in furtherance of the best interests of the Company and its investors.

61.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

62.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

        (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

        (b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

63.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

64.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

65.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and other unlawful conduct by the Individual Defendants.

66.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

67.    Plaintiff is a current owner of the Company's stock and has continuously been an owner of the Company's stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

68.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

69.    The Company Board is currently comprised of seven (7) members – Defendants Pender, Sabel, Orekar, Staton, Reid, Granat, and Christie.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.[1]

70.    Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein.  Because of their advisory, managerial, and

---

[1]    The Company admits in its Proxy Statement that Defendants Pender and Sabel are not independent.  Thus, futility need only be proven as to two (2) more directors.

directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

71.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

72.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

73.     Each of the Director Defendants, by virtue of their roles, were required to, among other things:  (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

74.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

75.    Each of the Director Defendants oversaw, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded or failed to oversee the wrongs complained of herein and are therefore not disinterested parties.

76.    Each of the Director Defendants reviewed, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

77.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

78.    Demand is further excused because the Director Defendants are each beholden to and controlled by Defendants Sabel and Pender who are the Managing Partners of Venture Global Partners II, LLC ("VG Partners") which holds approximately 97.8% of the total combined voting power of the Company's Class A common stock and Class B common stock.  As such, Defendants Sabel and Pender control the other Director Defendants' continued nomination to the Board, as admitted by the Company in its Proxy Statement, noting that "VG Partners effectively controls the outcome of matters submitted to stockholder vote."  In light of this control, the other Director Defendants cannot impartially consider a demand against Defendants Pender and Sabel, who are each interested, primary wrongdoers, as the Director Defendants are dependent on them for their continued directorship with the Company and the concomitant compensation. Thus, the other Director Defendants are unable to evaluate a demand with disinterest or independence given

Defendants Sabel's and Pender's control over them.

79.    Furthermore, each of the Director Defendants has served, and continues to serve, as officers and directors of VGLNG, a wholly owned subsidiary of the Company.  As such, the Director Defendants have pre-existing professional relationships with one another.  Because each of these Director Defendants has worked together with VGLNG for years, they each lack the requisite independence to be able to consider a demand to sue one another.

**THE DIRECTOR DEFENDANTS ARE
NOT INDEPENDENT OR DISINTERESTED**

**Defendant Sabel**

80.    Defendant Sabel is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Sabel cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

81.    As CEO, Defendant Sabel also fails the Nasdaq bright-line independence test as set forth in the New York Stock Exchange listing rules and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement.  As such, Defendant Sabel could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Sabel is therefore futile.

82.    Defendant Sabel also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums.  Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Sabel is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot

consider a demand to sue.

83.    In addition, Defendant Sabel receives lucrative compensation in connection with his employment with the Company.  Defendant Sabel is not independent from Defendants Pender and Reid who serve on the Compensation Committee alongside Defendant Sabel and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Sabel.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Sabel is neither independent nor could he consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

84.    Because of Defendant Sabel's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Sabel is unable to comply with his fiduciary duties and prosecute this action.  Defendant Sabel is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

85.    Defendant Sabel, along with Defendant Pender, is a Managing Partner of VG Partners, an entity which holds 97.8% of combined voting power and effectively controls the outcome of any shareholder vote.  Accordingly, Defendant Sabel lacks independence and could not objectively consider a demand to sue.

86.    Furthermore, as Managing Partner with Defendant Pender, Defendants Sabel and Pender have a longstanding business affiliation based upon mutual respect, causing doubt as to Defendant Sabel's ability to objectively consider a demand to sue Defendant Pender.

**Defendant Pender**

87.    Defendant Pender is neither disinterested nor independent and is thus incapable of

considering a demand to sue because he (as its Executive Co-Chairman and Founder) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Pender cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

88.     As Executive Co-Chairman and Founder, Defendant Pender also fails the Nasdaq bright-line independence test as set forth in the New York Stock Exchange listing rules and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement. As such, Defendant Pender could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Pender is therefore futile.

89.     Defendant Pender also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums.  Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Pender is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

90.     In addition, Defendant Pender receives lucrative compensation in connection with his employment with the Company.  Defendant Pender is not independent from Defendants Sabel and Reid who serve on the Compensation Committee alongside Defendant Pender and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Pender.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Pender is neither independent nor could he consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

91.     Because of Defendant Pender's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Pender is unable to comply with his fiduciary duties and prosecute this action.  Defendant Pender is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

92.     Defendant Pender, along with Defendant Sabel, is a Managing Partner of VG Partners, an entity which holds 97.8% of combined voting power and effectively controls the outcome of any shareholder vote.  Accordingly, Defendant Pender lacks independence and could not objectively consider a demand to sue.

93.     Furthermore, as Managing Partner with Defendant Sabel, Defendants Pender and Sabel have a longstanding business affiliation based upon mutual respect, causing doubt as to Defendant Pender's ability to objectively consider a demand to sue Defendant Sabel.

**Defendant Staton**

94.     According to the Company's 2025 Proxy Statement, "the Company entered into settlement agreements with Jimmy Staton, a member of its Board, pursuant to which Mr. Staton received $10.0 million and $29.2 million, respectively, related to a cash settlement of certain expiring option awards originally granted by VGLNG to Mr. Staton in 2014 and 2015, respectively, in his capacity as a director and employee, respectively, of VGLNG."

95.     Accordingly, having entered into this agreement with the Company to receive such large sums of money, Defendant Staton cannot be considered independent or reasonably consider a demand to sue the officers and directors that permitted the Company to enter into such an agreement.

96.     Furthermore, Defendant Staton has served on the board of directors of VGLNG, a

wholly-owned subsidiary of the Company, since August 2014. Defendant Staton was formerly VGLNG's Executive Vice President from January 2015 to November 2016. As a result of his executive roles with the Company's subsidiary, and the compensation that he received pursuant to that position, Defendant Staton cannot be considered independent.

**Additional Reasons Demand is Futile**

97.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

98.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

99.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the

Director Defendants face a substantial likelihood of liability and demand is futile as to them.

100.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

101.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

102.    Publicly traded companies, such as Venture, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages.  If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

103.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence.

Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

104.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

105.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

106.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

107.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

108.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

109.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost

of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

110.    Plaintiff incorporates by reference and re-alleges each allegation set forth above, as though fully set forth herein.

111.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

112.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

113.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

116.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*:  (i) paying excessive compensation and bonuses to certain of its

31

executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

117.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

120.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

121.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Underwriter Defendants for Aiding and Abetting)

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    The Underwriter Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

124.    Specifically, the Underwriter Defendants, while concealing Venture's issues which they knew about, or by virtue of their access to Venture's information, should have known about, permitted and/or caused the Individual Defendants to issue materially false and misleading statements to the public, including in the Company's SEC filings.

125.    As a result, the Underwriter Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

126.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

127.    As a result of the misconduct alleged herein, the Underwriter Defendants are liable to the Company.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment;

C.      Awarding, against the Underwriter Defendants and in favor of the Company, the damages sustained by the Company as a result of the Underwriter Defendants' aiding and abetting;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 7, 2025                    **WILLIAMS & SKILLING, P.C.**

                                        _/s/ Charles L. Williams_____
                                        Charles L. Williams (VSB No. 23587)
                                        7104 Mechanicsville Turnpike, Suite 204
                                        Mechanicsville, Virginia 23111
                                        Tel: (804) 447-0307, ext. 305
                                        Fax: (804) 447-0367
                                        Email:  cwilliams@williamsandskilling.com

                                        **GAINEY McKENNA & EGLESTON**
                                        Thomas J. McKenna (*pro hac forthcoming*)
                                        Gregory M. Egleston (*pro hac forthcoming*)
                                        260 Madison Ave., 22nd Floor
                                        New York, NY 10016
                                        Tel: (212) 983-1300
                                        Fax: (212) 983-0383
                                        Email: tjmckenna@gme-law.com
                                                gegleston@gme-law.com

                                        *Attorneys for Plaintiff*

34